Please the court. Firstly, I apologize for the delay. I had some technical difficulties and I'm now unfortunately having to work off my phone which seems like the last resort but the one I'm I'm forced to take. Please the court. This is both a simple case and a very complex case as it follows an extensive trial which adjudicated a number of overlapping facts concerning the matters here involving the CDPH and Dr. Chaudhry. In effect, just to provide some phenomenally lost the Perez case in part because of disclosure of a report that was exceedingly damaging. Can I can I push back on that on a number of you may because I mean you say it was because of that report and yet I thought that the by by the government agency about this incident. There's testimony that I believe you conceded that there was another doctor there at the hospital was leaked by Robillard. You're correct. So I don't understand how you can put the blame at the feet of of the government agency when they weren't even the ones who directly notified Perez about this incident. I'm providing context not in terms of the argument here. Well because you have to prove that I mean your argument is that that there was causation. I think this goes to your whether you've proven causation here. You you argue that there was causation for the harm that was in that your client suffered. No question your client suffered some harm. The question is you know what what caused it one of the questions anyway. But what caused it was the dissemination locally throughout the hospital of a report which was materially false. The the government has the CDPA. I don't know how can you say that I mean what the the hospital was investigating the hospital had asked him to step down as the head of surgery before the government was even notified or maybe not before they were notified but certainly before they'd even distributed a report even a draft report. Though the government was fully involved at that point the report wasn't issued. But so how could the report have caused the loss of that position? Sorry your honor. I cut you off. No no you didn't go ahead just I was just asking how it could be caused by a report that didn't yet exist. Well the damage the loss of Dr. Chaudhry's position was not nearly all of the damage which had which occurred. That was only one aspect of the loss of his position. There was a domino effect once this report occurred after after the issuance of the report the economic damages flowed into many years later. I the Perez case especially where you have an amended report that comes out after the damages are done. If I can pedal back a little bit and because the causality issue is a very important issue in this case and the court is I think focusing on a key aspect of this which ties in a little bit to Judge O'Neill's prior ruling. But I want to go back to what I think is a couple of the issues here and I'm gonna kind of begin and end with the McComb testimony which I think got very short shrift and a very incorrect ruling by Judge Boone. The notion as I understand that ruling that there is not a successor in interest. Dr. in terms of the Perez plaintiffs and and that's just fundamentally incorrect based upon the record. There is a the the notion as Miss Esquivel has clearly articulated the CDPH is clearly articulated is that Perez was only interested in the standard of care and the hospital was only interested in the First of all the McComb testimony that was kept out clearly indicated that the CDPH was involved in precisely making sure that Dr. Chaudhry was punished whether you call it more specifically harsher. Well that's your gloss that's your gloss on it. Can you tell me why you think that because when you read the testimony McComb says that's not what she was trying to do. She was just trying to say you gotta be more specific in in how you you know in in in whatever punishment you do give. I didn't sense anything from the testimony that they were saying oh you've got to take specific actions you've got to be more harsh. So tell me what I guess all this goes to is even if you're right that there might have been some some problem with admission how is it prejudicial to your client because I didn't see McComb actually saying what you're now saying her testimony stands for. You know I'm not supposed to ask questions of the fact that she famed forgetfulness about her prior testimony. This was somebody from the hospital asking for rewrites of a CDPH 2567. Now we can I don't know how much credibility we want to assign to Ms. McComb and I guess I would have had the opportunity to ask those questions had the testimony been allowed in but there is there is rewriting send it back to the CDPH for whatever you want to call it. But there's a specific question it so the state is telling you that they want harsher discipline visited on Dr. Chaudhry in the plan of correction is that right and she says no. So she's saying no they weren't saying harsher discipline they just wanted it what we were doing to be specified clearly. I guess I don't understand how that even if she should have been allowed in how that statement helps you. I guess harsher discipline is in the mind of the beholder your honor. I don't know that given the the limitations that I had on questioning Ms. McComb when you say more specific with making sure he was not the head of of that he was removed as the head of a particular a of the committee of a surgery director again to rely upon that single word it's not harsher. Well hold on okay where did you ask those follow-up questions then because we're reading the testimony here where she said no I didn't ask for anything harsher did you follow up and say well what were you reckon I mean can you point us to other testimony that suggests she may have you know she may have been asking for something harsher. I wasn't allowed to get into that because she had clearly saying forgetfulness about testimony that she had given very specifically years before and so I wasn't where's the testimony that she gave years before that she was asking for harsher penalties. The testimony years before was merely that she had asked for corrections. I don't think the panel and was that in the in the malpractice yes yes yes um she tested what the testimony I would have read was that was that there was more than one set of corrections which by the way was the first time that it heard it's not before the panel but that doesn't seem any that doesn't seem at all inconsistent with her testimony uh in the record at 2 ER 181 to 182 where she said no we did I mean we did ask for them to be more specific I mean what she says is no they wanted it specified clearly instead of saying MEC met on uh 812 and discussed the incident and levity of suspension she wanted it clearly laid out what education what suspension everything that MEC had for that particular incident so sorry go ahead I don't think it's possible to look at McComb's testimony in isolation from the blatant mistakes and and frankly what I have come to believe is Shirley Campbell's uh you know personalized arbitrary standard um as to uh how to treat uh evidence that was being uh expressedly confirmed that uh she thinks that can't uh Shirley Campbell is a person of integrity you agree with that that I guess that might go to some distance toward explaining why she didn't remember her prior testimony uh I don't know that I would rely on Miss McComb what I would rely upon is the evidence in this case and and the 2567 before it was amended um was full of Miss Campbell's personal spin uh whether it was the misinterpretation or miss uh you know including false statements from Dr. Utrecht uh whether it was taking uh Shor's uh testimony one way and reporting it completely differently uh um uh whether it was the the blatant ignoring of the of the swipe cards which ultimately I think resulted in the amendment of the um so let me I mean because you're bringing up a lot of these and and you're kind of throwing a lot against the wall so I mean that's been what's hard about this case is peeling that back let's deal with the swipe specifically okay you've got a point right and it sounds like they did amend it and and honestly that seems to be one of your strongest arguments is that the report was amended that he you know he didn't leave at 11 45 a.m he left at 12 15 p.m uh but the question is whether that it makes it is it still substantially true and the testimony seems to be that even if he left the room at 12 15 he left before the patient was fully uh closed up and that seems to be the gist of what's going on here and and you seem to agree with I I mean your client even seems to agree that he left before the chest was fully closed now there's a debate about what that means but the factual dispute doesn't seem to be in question I don't think the issue is the chest closed up they they that doesn't seem to be the issue that does seem to be the issue because that was the hospital policy was that you couldn't leave before the chest was closed up now I have no idea whether a doctor should be able to leave five minutes before or 10 minutes before but that seems to be the case maybe I have the disadvantage of having been the trial attorney sometimes that's an advantage sometimes not the issue about Dr. Chaudhry leaving at the 11 45 versus 12 15 the basis of that was it was a false reporting to ensure that there wasn't any question that Dr. Chaudhry had left too early that he had left um well well there wasn't even a determination that the patient was stable because in effect he had scooted off to lunch um well leaving unqualified people a surgeon of 30 years and and Miss Alvacoba who's where they didn't have a privilege card in advance indicating that she couldn't do what he had left her to do but setting aside that the 12 15 to me is I don't want to say a little bit of a red herring but the issue is stability the issue was was right okay so let's go to stability because I mean the testimony seemed to uh that um that he was not yet stable he was oozing blood wasn't that the testimony from the uh the the maybe I have it wrong the PA you're talking about the profusionist well Alvacoba in part and the profusionist whose testimony was a little bit all over the map um that the issue of of stability I think was um you know you've got Shirley Campbell's notes um and and that they run contrary to her own statements in the 2567 and there are material differences in those where she adds uh in effect uh testimony evidence that's not in her own notes blatantly especially on the issue of stabilization so the the issue they move the times and I I think we you know all of us can step back this is you're you're referencing uh Alvacoba right or I'm talking about Campbell's notes well sorry so I'm referencing Alvacoba at 2 ER 241 Alvacoba says she was concerned that the patient was oozing blood and the question is did the fact that this patient was having oozing was that as a PA was that of any concern to you it's always a concern always a concern and why is that because maybe patient needed to be watched longer maybe you need to add additional testing I mean it's just like I said it's not like I will order and will and we will do that it's a surgeon's job so I mean maybe she's lying maybe she's misconstruing it I don't know but the district court the question is was he clearly erroneous and relying on that testimony to say the patient was unstable and and just to follow up on that is we understand what you're saying your argument it's in a way another closing argument but ultimately isn't the question here given the standard of review whether the district court was clearly erroneous in the determinations and conclusions that were made I think in the taking that as a question I think in the context of the the amendment of the 2567 of the manipulation of the of the reports that were prepared by the CDPH the inconsistency in Mr. Schor's recollections and the use of those recollections the animus displayed by by adding things that were not in their own notes I think the court was erroneous in concluding I in my view I think Judge Boone discretion one thing cherry picking is another there was a considerable effort here to disregard any of Dr. Chaudhry's testimony which I think was in sync with not only the amended more of the the amended 2567 but in terms of Ms. Campbell's notes which which did not support that Dr. Chaudhry had left the room prior to the stabilization there's there's always as the as the record makes clear there's always going to be I mean I'm not a doctor but there's not oozing when the chest is closed so I mean there's a question about whether the oozing and that it leads to stabilization but I don't think it's fair to say that there's always going to be oozing I guess what I'm saying is some release of of fluids is not inconsistent with stable with the patient being stable that that may be that may be I don't know but the district court found otherwise yeah could I could I sorry I wanted to probe the the liberty interest issue in this case and I want to be clear in my my own mind your position does your client well that Dr. Chaudhry purport to have been deprived of a property interest a liberty interest or both and please articulate the interest for us the interest was the right to a hearing I believe Dr. Chaudhry had an interest by way of his considered in light of a full airing of all the facts which didn't occur until but isn't the hearing the procedure that you think you need but what was he deprived of was he deprived of some property like his position at the hospital was property or was he deprived of some liberty like his position at the hospital was liberty what are you saying exactly yeah I think there's some overlapping you know Venn diagrams here that Dr. Chaudhry the the the the interest identified by Judge O'Neill was a I guess you would call it a quasi property interest by way of his reputation and his ability to continue to function in the context of earning a living being a lead surgeon and all of those things so there is to my mind there is a clear property interest that has been infringed here and I think Judge O'Neill stated as much do we know whether Dr. Chaudhry was foreclosed from all future employment does it matter whether he was foreclosed from all future employment well having led left of Pakistan I'm I'm I'm left to speculate his income dropped to several percent of what he had earned before so I don't know that whether he was foreclosed from all future employment or not is really goes it is necessary to ask he's still licensed to practice medicine in California right my understanding is yes your honor though though I don't I don't think whether he's licensed or not doesn't mean there there wasn't damage created by the dissemination of of the inaccurate 2567 okay we've taken you over your time but we'll still give you a minute for a rebuttal but let's hear from your opposing counsel thank you very much good morning your honors Diana Esquivel for the appellees defendants after a five-day bench trial the district court correctly found that plaintiffs failed to show that the statements in the published report were substantially false unless the court has some specific questions I want to address two issues the first dealing with the swipe cards the second dealing with whether it was an abuse of discretion to exclude Miss McComb's testimony the court has already asked questions about the swipe cards so I just want that since it's already been raised first the swipe cards themselves and the information regarding the swipe cards that were marked as plaintiff's exhibit 119 were not introduced into evidence the only evidence regarding the side cards that was presented at trial was Miss McComb's testimony as to why she did not consider the wipe cards a reliable source during her testimony she explained that in her experience swipe cards are not reliable or she did not give them greater weight in assessing her conclusions when she was drawing her drawing up her federal 2567 because as she mentioned in her testimony that individuals sometimes lend each other their swipe cards people hold doors for one another such that swipe cards are not needed to not give them but didn't the swipe cards show that he left to her attention didn't the swipe cards show that he left the room at 12 15 or the room or the hospital I'm not sure which at 12 15 as opposed to 11 45 wasn't that the basis for amending the report the yes I can't say uh I would just say your honor to answer the first part of your question that it wasn't an uh a stipulated undisputed fact that Dr. Chaudhry left the operating room at 12 15 so why did the report say 11 whether that was based I'm sorry why did the report ever say 11 45 how did that error creep in my understanding is that it that uh timestamp came from Mr. Yusef's who was doing the state investigation interview of Mr. Schrewer the perfusionist that originally that time was obtained from um the the perfusionist I could be wrong it might have been Ms. Campbell during her interview but it was during one of the interviews of the personnel in the operating room that led to uh and it might have been a confusion because 11 45 was time that Mr. Perez came off the bypass machine around that time so when when it's in terms of going back to your oh go go ahead answer the rest the second part I was just going to go the swipe cards it was never conceded that the 12 15 I mean I'm sorry that the 12 15 time period was derived from the swipe cards in the amended joint pretrial statement fact number 25 that again this is a undisputed stipulated fact that the hospital uh provided um based on the hospital risk manager interview and a comparison with the clinical hospital records showed that Dr. Chaudhry left the operating room at 12 15 p.m. it was never stipulated to that it was the swipe cards that confirmed that time okay it was never stipulated to some degree I think the swipe cards are not particularly relevant here I I'm more interested in what is the nature of the 12 15 p.m. obviously this was a key period of time and it seems like a lot could have happened in that half hour and so it I mean I'd just be interested in your view on why when they they write up a report that says he left at 11 45 a.m. that leads you know to the patient wasn't stable uh you know he wasn't closed up all of these other things then they change it to 12 15 but they don't amend any of the other statements it seems to me that that extra half hour would have had some relevance that probably should have been discussed about stability or policies or whatnot so why why was that the sole amendment that was made or or am I wrong about that maybe more was amended than just that uh first of all we don't know why it was amended because that was never introduced into evidence but but I don't really care about that right now I want to know right clearly there was a report that was based on 11 45 and then they just change it and say 12 15 we got it wrong but there's no discussion about the ramifications of what that has to do with the is that the time itself for purposes of a stigma plus claim has no significance because whether Dr. Chaudhry left at 11 45 or 12 15 the time itself that someone left at a specific time is not a stigmatizing statement it's what the fact that he left when his patient was his chest was still open his patient was still unstable but but my point is my point is that extra half hour there was a determination made that the patient was unstable at 11 45 and that Chaudhry left at that time if you're going to change the time to 12 15 isn't there some duty to analyze that and say okay well now we we determined the patient was unstable at 11 45 a.m but now we need to look at was the patient unstable at 12 15 and that doesn't seem to have been done at least as far as I can tell that they basically just said well who cares it was really 12 15 but none of the other facts are different well the facts were different I mean the patient was in a different position a half an hour later now maybe he was but I don't see that analysis being done well it was done your honor in the sense that when Miss Campbell was interviewing the staff members that were present in the operating room she wasn't looking specifically at times that events were occurring although that was a consideration it was also a sequence of the events and what information she was receiving from the person from the medical staff that were present in the operating room during her interview with the perfectionist and Mr. Schrewer he informed her that when Mr. Perez came off bypass shortly thereafter Dr. Chaudhry left the operating room so your position is the same information from the nurses so I just want to be clear your position is that the 11 45 to the 12 15 had nothing to do with the progression of this all the other testimony remained the same about the time and stage of the surgery that he left they just had the time wrong initially correct your honor and again the the matter of the time did not arise until a few years later because the 25 64 wasn't amended in my mind the time raises a question about whether the investigation was properly done and how accurate it was now and so I'm not sure I mean I'm interested in this view that a few years later you realize oh we've got a half hour wrong and the assumption seems to be well yeah but this the stage was all the same it's just we had the time wrong on the stage and I just don't know I'm interested in your view on what ties that together to lead to that conclusion maybe that's correct I just didn't see any analysis of it uh correct your honor and the reason there there was no information about that at trial was because miss campbell who was a defendant was not involved in in amending the 25 the state report so can I ask a follow-up question about this so so it seems like you're basically answering judge nelson that we have a series of events let's call it a timeline we thought that timeline sort of ended at 11 45 but in fact the whole thing just shifts and really ended at 12 15 but nothing changed about the timeline it just was half an everything was half an hour later than we thought at one point is that supported or were there tests and things done in between that we know the time so we we know that couldn't have been true that it just was half an hour everything was half an hour later uh the what was presented at trial showed that the time of 11 45 was simply a mistake but were there things inside I just don't remember the exact word was there like any other evidence that we know happened at noon yes we have mr schuer's note uh he testified that he kept the contemporaneous note on his phone as the events were developing and we submitted that with the supplemental excerpts of record and I can provide you with so if that's true then how how could the timeline just have shifted it if we know something happened say in the middle of the timeline and at one point we thought that was noon now how could it all of a sudden be 12 30 it doesn't quite make sense the answer to judge nelson I think right so mr schuer testified submitted into and it was submitted to evidence about his contemporaneous note that dr chaudry at 1205 left the operating room when miss albacova started closing the chest so again now we have a different time now he's saying 1205 so this is where it was within the purview of the district court as a trier of fact to look at what does the time really mean when you have these conflicting testimonies you had the testimony of miss albacova although she never stated a specific time her testimony was very clear that when she started uh was about to put in the chest tubes and and close the sternum she saw dr chaudry heading towards the door and asked him you're not leaving are you and he told her no no no no I'll be here I'll be here and and then she saw him walk out the operating room so as the trier of fact the district court had times that didn't match up but had testimony that said that dr chaudry and it was within his purview to decide what way to give it especially when the sequence of events the the evidence was more substantial to to to make it uh to show that dr chaudry had left even though the time itself the times 11 45 12 5 12 15 themselves could not be lined up so when you have that conflicting evidence as a trier of fact the district court had was fully authorized to make that credibility determination as to what weight it was going to give the times what weight it was going to give the testimony of each of the witnesses such that uh despite the inaccurate times or the conflicting times that dr chaudry left in the overall uh uh in the totality of all the evidence that was presented in trial the district court found that it was the sequence of the way the events occurred that it was more more likely true that dr chaudry left before the chest was closed well and didn't didn't dr chaudry this seemed to clinch it for me and so correct me if i'm wrong didn't dr chaudry actually acknowledged that he left before the chest was was fully closed closed and i i thought his position was you know it was far enough along i thought i was okay and i left it in the hands of of who you know surgeons that i thought were authorized to do this do i have the testimony wrong about that uh no your honor my recollection also is and i'm sorry i have not viewed his uh reviewed his testimony fully um in a while is that he laughed once the the skin was being sutured and that was his position and according to dr chaudry's testimony that was compliant with the hospital bylaws but but as doesn't that sort of crystallize what we're trying to decide because if he left when the skin was being sutured that's a little bit different it seems to me than a statement that he left when the chest was open you know and and and that's what i'm reporting is that the government report is kind of like well who cares about 11 45 to 12 15 well i think it could have had some impact i mean there's a big difference between leaving whether you've got the chest you know gaping open with oozing blood or whether you're just suturing up the skin because the sternum had been closed and other things so can you address that because i that that i'm just interested in what the response is wasn't there a duty for the government to go a little bit further and say hey we might have had some other facts wrong now the gist of it isn't wrong he still violated policy but he violated it in a much less he may have violated it in a much less extreme way well the uh miss campbell did do her diligence your honor as she testified she spoke to all the personnel staff and again just just like the evidence that was presented at trial she received conflicting uh uh uh statements from individuals she received the statement from mr schreuer that albacova hadn't uh was about to start suturing the chest closed when dr chaudry left she had the the testimony of nurse or the interview notes uh her interviews of uh nurse pro who said that dr chaudry left as was his custom to leave albacova to close the chest and suture the skin she had the test uh the interview notes from miss allen and i believe it was nurse allen and i apologize because there was uh another nurse in there who said no dr chaudry left once the skin was being sutured so she did do her diligence but based on the information that she had she drew she had the uh sufficient information to draw the the the conclusion that dr chaudry left when uh the chest was still open and that was not a substantially false statement because she had evidence to support that statement being dr mr schreuer's uh statements to her as well as nurse uh so the standard for a stigma plus is not whether the the the the the statements are a hundred percent false it's if they're substantially false and that miss campbell knew that they were substantially false but the evidence presented a trial showed that she had a basis now based on her interviews of the personnel staff to conclude that it was this is what had occurred that dr chaudry left when mr perez's chest was still open i'm sorry your honor had a question yes so the uh with respect to the uh the suit under 1983 as i understand it uh the plaintiff has an obligation to uh establish the conjunctive elements of a stigma plus uh due process claim correct so if one of those bases is not established what happens to the claim it failed to meet their burden of proof which is what happened here but judge uh boone nevertheless still addressed the plus element of the claim here after judge boone found that based on all the evidence that was presented a trial plaintiff failed to meet their failed to meet their burden to show that the statements the stigmatizing statements were substantially false and that miss campbell mr lopez uh were aware that they were substantially false and he judge boone could have stopped his analysis there and that would have been proper but yeah uh judge boone proceeded to also address the plus the the liberty interest that can you address in a few seconds remaining the causation question uh would a finding that cdb ph somehow influenced or coerced the hospital's determination to discipline dr chaudry be decisive on causation no no it would not be because that that first of all never happened as these court the court has already recognized that miss uh mccomb never said that uh the department miss campbell or anybody else pressured them to levy stricter or heavier penalties against dr chaudry but the causation also requires the but for analysis which judge boone adequately addressed there was no evidence presented that dr chaudry uh contracts with the hospital were terminated because of any statements uh assuming they had even published the statements by uh miss campbell or mr lopez there was a lot of evidence to show that during this uh soon after excuse me for a second sorry about that um that dr chaudry had several medical malpractice lawsuits pending against him in addition to the perez case that the contracts with the hospital were still being fulfilled by valley medical so even though dr chaudry himself had been removed as the chairperson his practice or the practice of which he was involved in valley medical was still fulfilling those um those duties and receiving the income so given that evidence the district court properly found that plaintiffs failed to meet their burden to show that the loss of revenue the in the eventual loss of um the practice was caused by anything that the defendants did and again that's based on an assumption had plaintiffs even approved met their burden to show that miss campbell or mr lopez published the statements which the evidence showed that they never did to the extent publishing again judge boone discussed it in the alternative even assuming that he accepted that publication did not mean uh a wide dissemination of the information it was limited to the hospital there was no evidence that miss campbell or mr lopez ever disseminated the information to anybody other than the ceo who was responsible for responding to the statement of deficiencies unless your honors have any other questions i see i've gone way over my time um i would submit and ask that you affirm the judgment thank you counsel uh because we went over time let's give you two minutes for rebuttal so we can't hear you yet i i think you're still muted okay thank you it's ludicrous to suggest in a surgery that had the detailed kind of information as to what happened when in the precise manner in which it happened including miss albacova's testimony including the profusion of shore uh recollections which i'll get to briefly in a second which were utterly misused uh by cdph um to suggest that skipping it forward half an hour doesn't change anything it changes everything because it puts albacova have times in her description of the events no she had the sequence of events that occurred throughout the throughout the the surgery skipping it forward as though it doesn't change anything disregards the fact that the the 11th the stipulation to the 12 15 was a huge fact because in effect what they were conceding was the chest was far more closed up and this patient was far more stable and they didn't want to worry that and they wanted to put out a a wrong number until they amended it the the key to the 11 to the 11 45 was precisely the issues that we've been discussing here which was what was the state of the chest what was the state of the patient and was he stable or not the notion that campbell engaged in a diligent work and believed some people rather than others doesn't explain why mr shore's testimony the the interview that was taken that was borrowed by the from the feds back to the 2567 was a materially miss misstated interview or why miss campbell says uh something in her notes that i mean something in the 2567 that's not represented in her notes these were material misrepresentations to make dr chaudhry and they didn't investigate it they didn't investigate it until after whatever damage was done was done that it's it it simply it it it it beggars uh any rational understanding of what the cdph was doing council can i just and i know we're taking you over but i'd be interested in your response to what i seem to understand from the record which is that at the end of the day i i actually agree with a lot of what you said except that dr chaudhry seems to suggest that he still left before the chest was fully closed and you know whether it was on what spectrum of negligence that possibly was he was violating policy at that time now i think your response is that's not what the policy was but say we find that the policy was that the chest needed to be closed before he left there's no disagreement even from your client that he left at some stage before the chest was fully closed is that correct you know one of the things that happens in medical malpractice cases which i have i've done for years is you know dr chaudhry after the fact you know 2020 hindsight said you know it wasn't a good result there are probably things i could have done differently uh i don't think the record reflects that he admitted to leaving uh before the chest was closed the question is what does the closing of the chest mean it's is it skin is it sternum is it the layers between um i i think it is impossible um not to um recognize that by moving it forward half an hour you're basically saying the chest wasn't closed or moving it back half an hour i guess is the way to say it is the sternum wasn't closed that you were whatever you were allowing this albacova to do which wasn't clear until privilege cards were created after the fact whatever you were allowing to do she wasn't allowed to do this and you skipped out before really the surgery was complete and when they moved it to 12 15 they acknowledged that that wasn't true and and that's why there was such a determined effort by shirley campbell in terms of her notes in terms of mr shore um uh you know miss i'll just end with saying miss esquivel says well the court can pick and choose from what it wants uh and there's evidence there and there was evidence there for miss campbell well like with miss campbell they there was a substantial amount of evidence um that that dr chaudhary had left well the patient had a level of stability that allowed him to walk out when he left at 12 15 not at 11 45 thank you both sides for the helpful arguments this case is submitted and we're adjourned for the day thank you very much everyone stay safe
judges: FRIEDLAND, NELSON, Katzmann